UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 6:10-CR-34-GFVT-HAI-1 |
| v. ) | |
| ) | RECOMMENDED DISPOSITION |
| DENNIE WAYNE TAYLOR, ) | |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court, on referral (D.E. 98 at 2), considers reported violations of supervised release conditions by Defendant Dennie Wayne Taylor. District Judge Van Tatenhove entered a Judgment against Defendant on March 2, 2011, for aiding and abetting the possession of items used to manufacture methamphetamine. D.E. 66. Defendant was sentenced to 110 months of imprisonment to be followed by three years of supervised release. *Id.* at 2-3. On November 1, 2015, his term of imprisonment was reduced to ninety-nine months pursuant to 18 U.S.C. § 3582(c)(2). D.E. 71. Defendant began his term of supervised release on July 28, 2017.

On December 21, 2017, the United States Probation Office issued a Supervised Release Violation Report ("the Report"), and secured an arrest warrant on the same day. D.E. 98. Defendant was arrested on December 22, 2017. D.E. 103. The Report charges, as Violations #1, #2, and #3, that Defendant violated his Supervised Release conditions by committing three separate state crimes. First, Defendant was arrested on December 15, 2017, for Assault Fourth Degree- Minor Injury, which is a violation of K.R.S. § 508.030 and a Class A Misdemeanor. The Clay District Court complaint alleges that Defendant struck the side of Bradley Barrett's head several times on November 29, 2017. Second, on December 20, 2017, Defendant was

served with a criminal complaint summons charging him with Criminal Mischief Second Degree, which is a violation of K.R.S. § 512.030 and a Class A Misdemeanor. The Clay District Court complaint alleges that Defendant caused damage to several windows of a vehicle belonging to Michelle Asher on December 15, 2017. Third, Defendant was arrested on December 20, 2017, for violating an Emergency Protective Order, which is a violation of K.R.S. § 403.763 and a Class A Misdemeanor. The Clay District Court complaint alleges that Defendant violated the terms of an Emergency Protective Order by contacting Michelle Asher on December 18, 2017. All of these are Grade C Violations.

**I.**

Defendant's initial appearance pursuant to Rule 32.1 was held on December 28, 2017. D.E. 102. At the initial appearance, counsel for the government made an oral motion for interim detention. *Id.* The Court found that detention was appropriate as Defendant did not carry the heavy release burden imposed upon him under Rule 32.1(a)(6) and 18 U.S.C. § 3143(a). *Id.*

The Court conducted a final hearing on January 10, 2018, and afforded all parties the rights due under Rule 32.1(b)(2). The lone witness that testified concerning the substantive allegations against Defendant was Michelle Asher. She testified that she met Defendant in March 2017 at Dismas Charities, a halfway house program contracted through the Bureau of Prisons, where she was the social services coordinator and he was a client serving a term of home incarceration. Although Defendant maintained employment and tested negative for any drug use, he was reprimanded, lied about his location, and showed an attitude when he was required to answer phone calls to verify his location.

Defendant and Asher began a romantic relationship in August 2017, after Defendant's home incarceration ended and he was no longer a client of Dismas Charities. They began cohabitating in September 2017, but they began to argue when Asher expressed a desire to move out of Defendant's house. Asher became pregnant with Defendant's child.

Asher testified that Dismas Charities' employment policy prohibited employees from maintaining romantic relationships with former clients, and that such a relationship would result in termination. Therefore, she and Defendant intentionally kept their relationship secret. When they argued, Asher testified that Defendant threatened to expose their relationship. Ultimately, he confronted her on November 23 (which was Thanksgiving) at East 80 Grocery in London, took her phone, and revealed their relationship to Asher's employer, friends, and family by texting pictures of himself and Asher. She subsequently quit her job two days later, on November 25. She testified that she did not want to disclose their relationship at that time or suddenly quit her job, but was forced to because of Defendant's actions.

On cross examination, Asher testified that Defendant drove her to the grocery parking lot on November 23, whereas in the Petition/Motion for Order of Protection she indicated that Defendant had followed her there. She clarified on cross examination that Defendant drove her to the grocery store where her car was located, but that he had followed her earlier in the day.

Asher testified that she met with Defendant on November 29, 2017, to discuss a recent meeting with his probation officer. Then, she drove to meet Bradley Barrett, a longtime friend with whom she used to live and continues to share bills, in order to pay a bill. Defendant followed Asher to this meeting with Barrett, blocked both of their vehicles, exited his vehicle, and began to punch Barrett in the side of the head and ribs. Barrett remained in the car. Asher

3

testified that she witnessed Defendant punch Barrett multiple times, which resulted in a black eye, a laceration above his eye, and pain in his ribs. Barrett managed to drive his vehicle away. On cross examination, Asher denied threatening Defendant with an attack by Barrett; she stated that Barrett was unable to fight Defendant because of a disability. Defendant was eventually arrested on December 15, 2017, for assault in the fourth degree.

Asher testified that she and Defendant continued to exchange text messages and meet after the events of November 29. He accompanied her to the gynecologist on December 13 to check on the progress of the pregnancy. They discussed the status of their relationship, and Asher testified that she wanted to slow the progress of their relationship while Defendant wanted to increase it. However, Defendant also continued to threaten her. He told Asher that he would kill her if he knew that he would only receive five years in prison. Asher testified that, on a later date, she and Barrett were driving on East Highway 80 when Defendant attempted to force her and Barrett to pull over by driving on the wrong side of the road, stopping, reversing, and charging his vehicle towards her, which eventually forced Asher to drive into a ditch to get away from him. After calling 9-1-1, a police officer advised Asher to obtain an Emergency Protective Order.

Asher filed a Petition/Motion for Order of Protection with the Clay District Court on December 14, 2017. On the same day, Defendant sent Asher a series of threatening text messages. Defendant was served with the Protective Order Summons on December 15, 2017, which notified him of a court date scheduled in the matter and explained that he was required to stay 500 feet away from Asher and to refrain from contacting her. He subsequently sent Asher a private message on Facebook Messenger with the letter "y" on December 15, after he was served

4

with the Protective Order. Asher took a picture of the message, and that picture was tendered as United States' exhibit number one. She confirmed that she took the tendered picture, the message came from Defendant's account, and she had communicated via Facebook messenger with the same account before. Defendant was arrested on December 20, 2017, for violating the Protective Order. Asher maintained that she did not know applying for the protective order would cause Defendant to violate his supervised release in this Court.

Asher testified that, on December 15, 2017, Defendant turned his vehicle around after passing her on Highway 80. Despite having no plans to meet and not returning Defendant's text messages, Asher pulled her vehicle over and Defendant followed her. Initially, Asher testified that both vehicles pulled into the firehouse parking lot, but later confirmed on cross examination that they pulled into the courthouse parking lot and explained that the parking lots were adjacent to one another. Defendant then began to hit Asher's car with a large rock. Asher testified that "he just started hammering away with a big rock about the size of my head at the windows" of her vehicle. The United States tendered photos of the damage and a receipt itemizing the cost of repairs as an exhibit. Asher confirmed that the pictures depicted the true and accurate state of the vehicle and that the receipt depicted the cost of repairs. According to the receipt, the repairs totaled $692.57. Defendant was served with a criminal complaint summons on December 20, 2017, for criminal mischief second degree.

Asher denied threatening or bullying Defendant. Defense counsel tendered a picture of an undated text message in which Asher threatened him. She confirmed that the text message came from her, but stated that she was trying to "keep up with him." Defense counsel tendered a second text message in which Defendant requested that Asher leave him alone, and she replied

that he would not be able to do anything if she refused to leave him alone. Asher admitted to ripping the rearview mirror off of Defendant's vehicle during September or October, but denied damaging the windows of his vehicle in December because she has been on bedrest since December 26. She also admitted that she has a substance abuse problem and stated that she had shared this with Defendant.

Officer Nick Jones, Defendant's probation officer, testified that Dismas Charities did not report any violations prior to the start of Defendant's supervised release, he had cooperated with the USPO, and his former employer indicated that Defendant would be welcomed back after his supervised release violations were resolved. He also testified that Asher's testimony was consistent with his conversations with her.

Asher's testimony is not contradicted by any evidence offered by the defense. The defense ably pointed out some inconsistencies, but the parties agreed that if the Court found Asher's testimony to be credible, then the evidence was sufficient to establish the violations by a preponderance of the evidence. The government noted that Asher's entire testimony was consistent with her affidavit, Barrett's affidavit, and her conversations with Officer Jones. It argued that the inconsistencies in her testimony did not render it invalid, specifically that the inconsistencies regarding whether Defendant dropped her off or followed her to the grocery store were the product of a long day full of arguments and did not discredit the remainder of her affidavit. Additionally, the government noted Asher's demeanor and candor, emphasizing that she spoke carefully, tried not to demonize Defendant, expressed a desire for him to remain in their child's life, and took an appropriate amount of responsibility for their arguments without making excuses for their relationship.

Regarding Asher's knowledge of whether filing the petition for the protective order would violate Defendant's supervised release, the government emphasized that Asher had experience with clients in a halfway house instead of those on supervised release. Additionally, the government noted that Asher testified that she feared for her life when she filed the Petition/Motion for Order of Protection. Finally, the government argued that the text messages in which Asher threatened Defendant occurred in the context of other threats by Defendant.

Defense counsel challenged Asher's credibility because of inconsistencies in her testimony and the tumultuous history between her and Defendant, arguing that Asher filed the Petition/Motion for Order of Protection out of anger after losing her job. Further, counsel argued that Asher and Defendant had agreed together to disclose their relationship, and she had intended to quit her job soon after the disclosure. Counsel cited Asher's threatening text messages and questioned whether she knew that filing the Petition/Motion for Order of Protection would violate Defendant's supervised release conditions. Counsel acknowledged the authenticity of the pictures of the damaged car and the receipt for the repairs, but argued that they could have been manufactured by Asher. Counsel questioned whether Asher's testimony was true, despite the consistency between it and Officer Jones's testimony, the affidavits of Asher and Barrett, the court documents, and the pictures tendered to the Court. Further, defense counsel admitted that it was credible to find that Asher, who had just lost her job, would not spend over $600 to repair a car in order to falsify a claim against Defendant. Defense counsel stated that Defendant did send the Facebook message after he was served with the protective order and that the picture of the message authenticated by Asher established Violation #3.

The Court notes that Asher testified in detail and consistently with the court documents, Barrett's affidavit, the photos of the damaged car, the receipt of the repairs, the picture of the Facebook message -- the time stamp of which was out of her control -- and her conversations with Officer Jones. The Court rejects defense counsel's argument that Asher was not credible. Ultimately, she was effectively cross examined, but the minor inconsistencies revealed and alleged retaliatory motive do not undermine her consistent narrative. She testified that she did not want to exclude Defendant from the child's life, even after these events occurred, which the Court viewed as sincere. Asher's acknowledgement of her drug problem and unethical decision to enter into a relationship with Defendant bolster her credibility instead of harming it. The inconsistency regarding whether Defendant drove or followed her to the grocery is isolated and narrow enough that it does not cause the Court to question her overall testimony. The Court finds that Asher was a credible witness.

Further, as acknowledged by defense counsel, each substantive element of the state crimes has been established. Each statute requires intentional conduct. *See* Ky. Rev. Stat. Ann. § 508.030; Ky. Rev. Stat. Ann. § 512.030; Ky. Rev. Stat. Ann. § 403.763. Based on the testimony, the Court finds by a preponderance of the evidence that Defendant intentionally assaulted Barrett and caused the injuries Asher described, intentionally caused over $600 dollars in damage to Asher's vehicle as depicted in the pictures, and intentionally contacted Asher on December 15, 2017, in violation of the protective order. Therefore, there is sufficient evidence to find Defendant guilty of all three of the charged violations.

For purposes of Rule 32.1 proceedings, the United States established the violations under the standard of section 3583(e). The parties did not agree as to the sentence. The government

argued for revocation with fourteen months of incarceration followed by the remainder of Defendant's initial term of supervised release, or twenty-two months. Defense counsel argued for a term of incarceration within the Guidelines Range, with half of that term to be served on home or community incarceration, followed by an additional term of supervised release.

## II.

The Court has evaluated the entire record, including the previous revocation, the Report and accompanying documents, and the sentencing materials from the underlying Judgment in this District. Additionally, the Court has considered all of the section 3553 factors imported into the section 3583(e) analysis. Under section 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant pled guilty to aiding and abetting the possession of items used to manufacture methamphetamine, a Class C felony. *See* 21 U.S.C. § 843(a)(6); 18 U.S.C. § 3559. For a Class C felony, the maximum revocation sentence provided under § 3583 is two years of imprisonment. 18 U.S.C. § 3583(e)(3). The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the particular violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438–39 (6th Cir. 2007) ("Although the policy statements found in Chapter Seven of the United States Sentencing Guidelines recommend ranges of imprisonment, U.S.S.G. § 7B1.4, such statements 'are merely advisory' and need only be considered by the district court before sentence is imposed.") (citation omitted). Given Defendant's criminal history category of III (the category at the time of the conviction in this

District) and Grade C violations, Defendant's Range, under the Revocation Table of Chapter 7, is five to eleven months. U.S.S.G. § 7B1.4(a).

The United States argued for revocation with a fourteen-month term of imprisonment followed by the remainder of his current term of supervised release, which is twenty-two months. The government noted that Defendant's criminal history contains patterns of similar violent behavior. Specifically, the government recounted that Defendant's history contains charges of menacing and resisting arrest, theft, and terroristic threatening of police officers. While the government recognized that Defendant's current violations are different from his underlying offense, which mitigates somewhat, it argued that Defendant's current violations aggravate because Congress prohibits every person on supervised release, regardless of the underlying offense, from committing additional crimes. The government emphasized that Defendant's threats, manipulation, stalking, and assaultive behavior spanned months and culminated with the three underlying state charges. It argued that Defendant's communication with Asher in violation of the Emergency Protective Order could have been interpreted as a threat to her life because of Defendant's violent course of conduct and his previous similar threatening statements.

Another prominent factor, the government stressed, was the need to protect the public. The government highlighted that one of the current state charges, Criminal Mischief Second Degree, involved a dangerously large rock, and argued that only a gun could have made the situation more violent. Regarding Defendant's breach of the Court's trust, the government emphasized that Defendant is held to a higher standard as a supervisee and that he violated a "hallmark principal" of supervised release by committing additional state crimes.

10

The government argued that a within-Guidelines term of imprisonment was insufficient because Defendant committed many violent crimes over an extended period, but that a statutory maximum sentence of twenty-four months was inappropriate because Defendant's violation conduct differed from his underlying offense. It argued that an above-Guidelines term of imprisonment was appropriate because of the need to protect society and the need to address Defendant's significant breaches of the Court's trust. Additionally, the government recommended that the Court impose a special condition of Defendant's supervised release prohibiting him from contacting Asher and requiring a status conference if Defendant decided to have contact with his unborn child.

Defense counsel argued for a term of incarceration within the Guidelines Range, with half of that term to be served on home or community incarceration, followed by an additional term of supervised release. Counsel stressed that the purpose of supervised release is to resolve issues related to Defendant's underlying offense and to find new ways to treat unrelated issues that arise. Counsel emphasized that Defendant had a history of superlative behavior while on supervised release until the past three months, and noted that Defendant successfully maintained a job, passed all drug tests, and received overall positive reports from the halfway house program and his probation officer. Counsel stressed that Defendant's Grade C violations provided the Court with sentencing options, and encouraged the Court to focus on Defendant's underlying issues rather than punishment. Counsel suggested that the Court incorporate treatment for anger management into Defendant's sentence. While counsel acknowledged that Defendant has a history of disrespect towards authority, he emphasized that Defendant has shown respect towards the Court and his probation officer, and argued that Defendant was committed to meeting the

11

requirements of supervision. The Court should show Defendant leniency, counsel argued, while making it clear that his actions would not be tolerated. Defense counsel argued against a condition prohibiting Defendant from contacting Asher because it would prevent him from knowing the progress of the pregnancy and could interfere with his ability to participate in raising their child. Additionally, counsel argued that the current Emergency Protective Order would sufficiently protect Asher and that a condition prohibiting contact would intensify the situation by preventing communication.

Defendant addressed the Court and emphasized that he had changed significantly since his original conviction. He noted that he had successfully overcome his addiction to drugs, removed himself from people who continued to make methamphetamine, gained full custody of his son, and taken the steps necessary to gain full custody of his daughter.

### III.

To determine an appropriate revocation term of imprisonment, the Court has considered all the statutory factors imported into the section 3583(e) analysis, as well as the Guidelines Range. A fourteen-month term of incarceration is above the Guidelines Range. Here, the above-Guidelines penalty is justified because Defendant received a substantial ten-month downward departure at his original sentencing and his violations represent repeated violent and criminal conduct spanning at least one month. *See United States v. Johnson*, 640 F.3d 195, 205-06 (6th Cir. 2001) (explaining that courts must give specific reasons for deviating from the Guidelines Range and ensure that the extent of the deviation is justified); 18 U.S.C. § 3553(c)(2).

The Court considers the nature and circumstances of Defendant's underlying conviction. *See Johnson*, 640 F.3d at 203 (explaining that this sentencing factor focuses upon the original

offense rather than the violations of supervised release). Although Defendant's underlying offense is unrelated to his current violations, there are similarities between Defendant's violations and his previous criminal history. Defendant has a history of committing similar crimes, including terroristic threatening, theft, and menacing and resisting arrest. Each of these past crimes and the crimes underlying his current violations were violent and threatened identifiable victims. His criminal history reflects a longstanding disregard of authority. The need to deter criminal conduct and protect the public is clearly very strong. Regarding Defendant's history and characteristics, the Court agrees that Defendant has apparently resolved many issues he faced at the time of his underlying conviction, including his drug addiction. However, he is struggling with unresolved anger issues, so mental health treatment is warranted.

The Guidelines suggest that the ***primary*** wrong in the supervised release context is the violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b) ("[A]t revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator."). The Court must impose a sentence that is sufficient, but not greater than necessary, to address Defendant's breach of trust and the other statutory goals imported into section 3583(e). Defendant received a significant downward departure during his original sentencing; Judge Van Tatenhove departed downward by ten months from Defendant's Guidelines Range of 120 months. D.E. 64 at 5, 67. At that time, Judge Van Tatenhove told Defendant, "I am going to give you just a little bit of a break from the [120 month] recommendation that is in front of me as a down payment on the good decisions that I hope you will make when you are out and you return to the community and you

are moving forward." D.E. 64 at 66. Judge Van Tatenhove recognized that the ten-month downward departure was an investment in Defendant and a way to encourage him to make better decisions while on supervised release. Defendant did not repay this investment when he repeatedly committed violent crimes over a month-long period. He did not pause to consider the impact of his anger problem, nor did he consider contacting his probation officer to help him address it. A significant period of incarceration is necessary to address Defendant's repeated violent and criminal conduct. This type of behavior will not be tolerated on supervised release.

Ultimately, a sentence of fourteen months of incarceration is sufficient, but not greater than necessary, to meet the section 3553(a) factors incorporated into this analysis. *See* 18 U.S.C. § 3583(e). A significant period of incarceration is necessary to deter criminal conduct, protect the public, and address Defendant's significant breaches of the Court's trust. A sentence below the Guidelines Range is inappropriate because Defendant received a downward departure at his original sentencing. Home or community confinement are inappropriate because both would mirror the environment from which the current violations occurred and Defendant committed successive violations over a period that affected identifiable victims without pausing to consider his behavior.

A court may re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration actually imposed due to the violation. *See* 18 U.S.C. § 3583(b) & (h). The post-revocation cap depends on the "term of supervised release authorized by statute for the offense that resulted in the original term of supervised release." *See* 18 U.S.C. § 3583(h). Defendant's conviction under 21 U.S.C. § 843 carried a maximum supervised release term of three years. *See* 21 U.S.C. § 843(d); 18 U.S.C. § 3583(b)(2). Under

section 3583(h), the maximum is three years "less any term of imprisonment . . . imposed upon revocation of supervised release." 18 U.S.C. § 3583(h). Defendant's supervised release has not been revoked prior to these violations. The Court recommends that a term of supervised release be re-imposed for the remainder of his current term of supervised release, or twenty-two months. Defendant clearly struggles to control his anger, so mental health treatment at the USPO's discretion to help him cope with this is recommended.

The Court adopts the United States' recommendation that Defendant be prohibited from contacting Asher, with the modification that Defendant may contact her regarding matters related to their child with prior approval from the USPO. This prohibition will serve to deter criminal conduct and protect the public, while respecting Defendant's constitutionally protected relationship with his child. *See*, e.g., United *States v. Bortels*, 962 F.2d 558, 559-60 (6th Cir. 1992) (upholding conditions that are reasonably related to the defendant's rehabilitation and protecting the public); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (holding relationship between parent and child is a fundamental liberty interest protected by the due process clause).

Based on the foregoing, the Court **RECOMMENDS**:

    1.    That Defendant be found guilty of all violations;

    2.    Revocation with a term of imprisonment of fourteen months; and

    3.    A term of supervised release of twenty-two months, under the conditions previously imposed, with the following additional conditions:

        (a)    That Defendant be prohibited from contacting Michelle Asher except for matters regarding their child and then only with prior approval from the USPO;

    (b)  That Defendant be required to attend mental health treatment to address his anger issues upon his release.

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on District Judge Van Tatenhove's docket upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981); *Thomas v. Arn*, 106 S. Ct. 466 (1985).

This the 24th day of January, 2018.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge